# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| WINRED, INC.<br><br>Plaintiff,<br><br>v.<br><br>KEITH ELLISON, in his official capacity as Attorney General for the State of Minnesota; LETITIA JAMES, in her official capacity as Attorney General for the State of New York; WILLIAM TONG, in his official capacity as Attorney General for the State of Connecticut; and BRIAN FROSH, in his official capacity as Attorney General for the State of Maryland,<br><br>Defendants. | Court File No.: 21-cv-1575 JRT/BRT<br><br><br>**WINRED INC.'S<br>REPLY IN SUPPORT<br>OF ITS MOTION FOR A<br>PRELIMINARY INJUNCTION** |

## INTRODUCTION

This case is not about flower delivery. *See* ECF No. 39, at 13. Nor is it about social networking websites. *Id.* And despite the Defendants' insistence to the contrary, their experience with the federal Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, a statute in which Congress explicitly *preserved* State consumer protection act jurisdiction, *see* 15 U.S.C. § 8405, does not support any of their arguments. *See* ECF No. 39, at 13-14. Instead, application of that precedent only serves to confirm that, when Congress wants to allow States to retain their jurisdiction in a federally regulated arena, it knows how to make that clear.

Just as Congress's inclusion of a *non*-preemption provision in ROSCA made unambiguous its intent to avoid preemption for purposes of *that* statute, *see* 15 U.S.C. § 8405, the broadly worded preemption provision in the Federal Election Campaign Act ("FECA"), *see* 52 U.S.C.§ 30143(a), conclusively demonstrates Congress's reasoned decision to keep State Attorneys General from using State law to meddle in federal elections. At its core, that's all that matters for purposes of this case.

WinRed does nothing other than serve as a conduit political action committee ("PAC") that connects, via the internet, donors who wish to make *federal* political contributions with persons and entities (*e.g.*, candidates, political parties, and other PACs) that can accept such contributions. There is no sale of any good or service occurring. Rather, the categories of activities expressly preempted by FECA and the Federal Election Commission ("FEC") regulations are precisely the sort that WinRed undertakes. By facilitating the raising, spending, and reporting of earmarked federal campaign funds, WinRed's operations fall directly underneath FECA's preemptive umbrella. *See* 11 C.F.R. § 108.7(b).

Critically, WinRed's activities fully comply with all federal laws and regulations, which is a point worth reiterating given the Defendants' stubborn difficulty with it. If federal law (1) occupies a field but (2) does not forbid an action, that means (3) that the action is not forbidden under federal law. It also means, as a matter of blackletter preemption law, that it cannot be forbidden by State law. It does not mean, as the Defendants would have it, that States can contravene a federal decision to allow a practice

by using their consumer protection jurisdiction to fill what they perceive as an enforcement gap.

Reduced to its essence, this is all the Defendants can offer the Court. Federal law allows a practice that they disagree with, so the Defendnats have tried to target that practice through their respective consumer protection acts. But, because all three federal preemption principles foreclose the Defendants' ability to do so, WinRed is likely to succeed on the merits of its preemption argument. For these reasons and those that follow, the Court should grant WinRed's motion for a preliminary injunction.

## ARGUMENT

**I.      This Court has personal jurisdiction over each of the Defendants.**

As a threshold matter, the Defendants trot out the same personal-jurisdiction argument that forms the basis of their meritless Rule 12(b)(2) motion to dismiss. It might be true that the Attorneys General of New York, Connecticut, and Maryland have no office space in Minnesota; it is also entirely beside the point. Because all four of the Defendants have agreed with each other to act outside the bounds of their lawful authority, and overt acts in furtherance of that scheme have taken place in Minnesota, this Court has personal jurisdiction over all four under the conspiracy-based personal-jurisdiction doctrine. *See ASI, Inc. v. Aquawood, LLC*, No. 19-CV-763 (JRT/HB), 2020 WL 5913578, at *6 (D. Minn. Oct. 6, 2020) (citing *Yellow Brick Rd., LLC v. Koster*, 36 F. Supp. 3d 855, 864 (D. Minn. 2014) (citing, in turn, *Hunt v. Nevada State Bank*, 172 N.W.2d 292 (Minn. 1969))).

As discussed more fully in WinRed's opposition to the Defendants' motion to dismiss, *see* ECF No. 44, at 2-5, WinRed has established a prima facie case with respect to

each conspiracy-based personal-jurisdiction prong: *i.e.*, "(1) a conspiracy existed, (2) the non-resident defendant[s] participated in or joined the conspiracy, and (3) an overt act was taken in furtherance of the conspiracy within the forum's borders." *Yellow Brick Rd.*, 36 F. Supp. 3d at 864 (D. Minn. 2014). Indeed, alongside their August 19, 2021 opposition to WinRed's motion for a preliminary injunction, the Defendants submitted declarations that further established that this Court has personal jurisdiction over each of them. Each non-resident Attorney General references "the joint investigation by the Attorneys General of the States of Connecticut, Maryland, Minnesota, and New York that is the subject of this action." ECF No. 41 ¶ 1; *accord* ECF No. 42 ¶ 1; ECF No. 43 ¶ 1.

Viewing the evidence in the light most favorable to WinRed (as the Court must) demonstrates without question that this Court has personal jurisdiction over each of the Defendants. *See Westley v. Mann*, 896 F. Supp. 2d 775, 786 (D. Minn. 2012). Concluding otherwise would set a precedent in which Attorneys General from across the Country can work collaboratively and pool their resources against an unfavored entity, but any attempt to seek legal recourse against them for overreaching would have to be litigated in multiple jurisdictions simultaneously. The absurd result, of course, would be a colossal and needless waste of judicial resources.

For that reason, the Defendants' personal-jurisdiction argument provides no reason for denying WinRed's motion for a preliminary injunction. But, should the Court need further assurance, WinRed respectfully requests the opportunity to conduct jurisdictional discovery. *See Yellow Brick Rd., LLC v. Koster*, No. 13-CV-2266 (JRT/LIB), 2014 WL 12932224, at *4 (D. Minn. Feb. 25, 2014) (permitting jurisdictional discovery on

conspiracy-based personal jurisdiction because "[j]urisdictional discovery is generally permitted when personal jurisdiction is at issue"); *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008) (remanding for jurisdictional discovery).

## II. WinRed has demonstrated entitlement to a preliminary injunction.

### A. WinRed is likely to succeed on the merits of its preemption claims.

Having twice briefed all the reasons why each of the three federal-preemption theories (express, implied, and conflict) independently bars the Defendants' State consumer protection activities,[1] WinRed will try to reduce redundancy by incorporating by reference its arguments from its previous filings. *See* ECF No. 23, 5-18; ECF No. 5-16. It also bears reiterating that WinRed is a conduit PAC, and while the committees to whom WinRed forwards contributions may decide to use a variety of solicitation methods, including use of pre-checked recurring-payment boxes, these are *not* the actions of WinRed. In any event, the Defendants offer little more than a paltry list of reasons why they believe their State action is not preempted by federal law (without taking the time to address each theory separately). For the following reasons, the Defendants are mistaken.

---

[1] The Defendants make the cursory allegation that they have properly served their subpoenas and CIDs. *See* ECF No. 39, at 7-8. Despite their bare suggestion that they "served those subpoenas and CIDs properly and in compliance with applicable law," *id.* at 8, they cite only the law of their own jurisdiction—and not that of either Virginia (where WinRed is headquartered) or Delaware (where WinRed is incorporated). WinRed maintains that none of these subpoenas or CIDs have been properly domesticated or served, and it reserves it right to challenge them in the appropriate forum if that becomes necessary. Given the Defendants' agreement not to enforce them while the parties' respective motions remain unresolved, this question is not yet ripe. *See* ECF No. 29 ¶¶ 4-5; *see also* ECF No. 39, at 16.

*First*, the Defendants repeat the same flawed argument that they have in each of their earlier filings: *i.e.*, "the FEC has acknowledged that it lacks enforcement authority under FECA to stop the kind of deceptive pre-checked solicitations at issue here." ECF No. 39, at 12. Try as they might, though, this contention does not convert into an excuse for them to trespass into a field that the federal government has occupied. As discussed throughout WinRed's briefing, the FEC has taken no enforcement action with regard to pre-checked recurring-payment boxes because the use of pre-checked recurring-payment boxes does not violate FECA. Congress's decision not to forbid a practice, however, does not mean that Congress has left a void that State law may fill. It means, instead, that Congress has foreclosed States from penalizing that practice. The Defendants' suggestion that State law can penalize a practice that remains legal in a federally occupied field contravenes both logic and the law of conflict preemption.

*Second*, the Defendants dust off *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013), a case that in no way resembles the situation giving rise to WinRed's complaint. In *Janvey*, a non-FEC regulated entity committed non-election-related fraud that, by happenstance, resulted in the transfer of some ill-gotten funds to political committees. In the end, the Fifth Circuit held that non-election-related fraud perpetrated by a non-FEC regulated entity was subject to non-preempted State law. Here, though, the States are asserting prerogative to investigate an FEC-regulated PAC based on FEC-approved activity in a field (campaign finance) that is the precise arena that FECA was enacted to govern and that the FEC was created to regulate. In short, *Janvey* could not be more inapposite. The cases cited and discussed in

WinRed's previous briefing, in contrast, are fully applicable and dictate the outcome of this motion. *See* ECF No. 23, 14-18; ECF No. 44, 10-12.

*Third*, the Defendants discussion of *Galliano v. United States Postal Service*, 836 F.2d 1362 (D.C. Cir. 1988) (Ruth Bader Ginsburg, J.), misses the obvious point. As the Defendants correctly acknowledge, the D.C. Circuit held, in that case, that "the Postal Service could not use FEC-approved disclaimers as a basis of its mail fraud claim." ECF No. 39, at 16 (citing *Galliano*, 836 F.2d at 1370). The Defendants' analysis runs off the rails, however, by virtue of their failure to recognize that WinRed is making the same argument here—*i.e.*, the Defendants are not at liberty to use practices allowed by the FEC as a basis for their joint consumer protection investigation.

*Finally,* it bears noting that this is the Defendants' ultimate position: "[F]ederal political committees must comply with *both* FECA and state laws of general application." ECF No. 39, at 20 (emphasis in original). This argument, however, is woefully and fatally simplistic. Where, as here, enforcement of "state laws of general application" *interfere* or *conflict* with the carefully calibrated regulatory system established by Congress and the FEC, that enforcement *must* yield. At no point throughout this litigation have the Defendants acknowledged this principle (except to suggest, incorrectly, that federally regulated entities "could comply with [State] laws by abandoning the use of . . . pre-checked solicitations altogether," ECF No. 34, at 27, even though (1) WinRed does not use pre-checked boxes, (2) WinRed is not responsible for those who use pre-checked boxes, and (3) despite the legality of such solicitations under federal law). That point, however,

7

forms the gravamen of WinRed's lawsuit. At its core, this is why the Defendants' action must succumb to the Supremacy Clause.

For all these reasons, WinRed is likely to succeed on the merits of its preemption claims.

**B.     WinRed will suffer irreparable injury absent an injunction.**

Next, the Defendants suggest (incorrectly) that forcing WinRed to turn over droves of information to elected Democratic State Attorneys General would not inflict irreparable injury. Not so. Each and every type of harm outlined by WinRed in its initial filings is substantial and, once exacted, cannot be remedied.

*First*, the Defendants argue that "[c]ompliance with a subpoena does not constitute harm, much less irreparable harm." ECF No. 39, at 26. In isolation and at an unreasonably high level of generality, this might be true. In the context of this case, however, the Defendants are mistaken. Given that (1) WinRed provides services to Republican-affiliated entities and (2) the Defendants are all members of the Democratic party (three of whom have used WinRed's Democratic Party counterpart, ActBlue, to fundraise), the risk of irreparable harm if WinRed were forced to comply with *these* subpoenas and CIDs is quite manifest. Asking the Court to ignore this context is asking the Court to ignore reality.

*Second*, the Defendants insist that WinRed should not fear any competitive harm because compliance with their subpoenas will not result in *public* disclosure of WinRed's confidential or proprietary information. As an initial matter, this rose-colored-glasses assurance requires a suspension of disbelief; as the U.S. Supreme Court recently observed, State Attorneys General have been "unable to ensure the confidentiality

8

of . . . information" that should remain away from the public's eye. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2381 (2021); *see also id.* (noting that, in California, "nearly 2,000 confidential Schedule Bs . . . had been inadvertently posted to the Attorney General's website," while "[o]ne . . . expert witness[] also discovered that he was able to access hundreds of thousands of confidential documents on the website simply by changing a digit in the URL"). And in any event, this Court has found "irreparable harm from the loss of control over . . . confidential information," even when such information is (ostensibly) protected by sealed filings and protective orders. *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 405 (D. Minn. 2020) (Tostrud, J.); *see also First Fin. Sec., Inc. v. Moua*, No. CIV. 14-1843 MJD/SE, 2014 WL 3734259, at *4 (D. Minn. July 29, 2014) (Davis, J.) (because "Defendants have refused to return confidential information," "FFS is . . . entitled to an inference of irreparable harm."); *Hutchinson Tech. Corp. v. Magnecomp Corp.*, No. CIV 06-1703 JNE SRN, 2006 WL 2061707, at *4 (D. Minn. July 17, 2006) (Ericksen, J.) (similar).

In any event, though, the Defendants' argument misses WinRed's central concern. Irreparable harm would ensue even if they could be trusted to keep these documents out of the public eye because the Defendants are all political adversaries of the persons and entities that WinRed services.[2] In other words, disclosure of quintessential confidential

---

[2] This, of course, makes manifestly relevant the political motivations of the Defendants. Although the Defendants submit that they are also investigating ActBlue, three of the four Defendants have used ActBlue to fundraise for their own campaigns, and, upon information and belief, none of the Defendants thought it worthwhile to investigate ActBlue until now, even though ActBlue has been operating since 2004 and has used the

business and proprietary information to *the Defendants themselves* risks competitive and reputational harm.

This irreparable injury extends beyond the inner workings of WinRed to the relationships that WinRed has cultivated with third parties who rely on its services, many of whom have no interest whatsoever in having their communications with WinRed fall into the hands of four Democratic State Attorneys General. The subpoenas and civil investigative demands at issue here, though, seek precisely these communications. There is no way to remedy the reputational and relational wounds that compliance with these illegal subpoenas and CIDs would exact (even assuming that the Defendants kept them out of the public view), and the Defendants make no meaningful attempt to dispute this.

*Third*, the Defendants suggest that their subpoenas pose no threat to the First Amendment associational rights of WinRed and its client base.[3] Respectfully, the U.S. Supreme Court has, for more than six decades, rejected this premise, noting in 1958 that

---

same fundraising tactics that the Defendants try to attribute to WinRed, including the pre-checked box mechanism, for much of that time. For purposes of the irreparable-harm inquiry, the fact that the Defendants are all political opponents of WinRed's clientele places their motivations squarely at issue in this litigation.

[3] The Defendants' argument that "[t]here is no First Amendment right to deceptive speech and no First Amendment injury to be had in its restraint" not only begs the question but also evidences a fundamental misunderstanding of WinRed's First Amendment argument. ECF No. 23, at 39. Regarding the former, it commits this logical fallacy by assuming (incorrectly) what it is trying to prove—*i.e.*, that federally permitted activities are somehow deceptive. Regarding the latter, WinRed has asserted a threat to the First Amendment's *right of association*, which, per the U.S. Supreme Court's opinion in *Americans for Prosperity Foundation*, remains in the crosshairs so long as the Defendants' dragnet and overbroad subpoenas and CIDs remain live.

"[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958) (quoted in *Ams. for Prosperity Found.*, 141 S. Ct. at 2382). Nor does it matter that WinRed has already publicly disclosed some of the information requested by the Defendants, in accordance with WinRed's FEC disclosure requirements.[4] The fact remains that Defendants seek:

- "all communications" between WinRed and its clients, potential clients, or other parties concerning recurring donations, as well as representations about WinRed's ability to secure recurring donations for its clients, *see, e.g.*, Ex. 1 at 8-9; *see also* Compl. Ex. A, ECF No. 1-1 at 3;

- proprietary documents showing the conversion rate of website donors who made recurring donations in the absence of a pre-checked recurring donation box, as well as the conversion rate for when a pre-checked box was used, *see* Ex. 1 at 9;

- detailed information about WinRed's organizational structure, officers, and every one of WinRed's clients that have used recurring donation boxes in their fundraising solicitations, *id.* at 8;

- all web pages WinRed has hosted where donations were solicited using a pre-checked box for recurring donations and other text and images accompanying the pre-checked boxes, as well as how the interface, wording, or format changed over time for the page, *id.*; and

- all written policies and procedures (presumably including internal procedures) governing recurring donations, as well as internal analyses about the effectiveness and use of pre-checked donation boxes, *id.* at 8-9.

---

[4] Given that WinRed has already produced to the Defendants its public FEC disclosures while maintaining that it need not turn over the non-public information sought by Defendants, the Defendants' use of this point is especially meritless.

11

Given the sweeping nature of these requests, the argument that "[t]he Attorneys General's investigations and corresponding subpoenas are narrowly focused on the consumer harms caused by prechecked boxes" in a way that does not offend the First Amendment is a contention that deserves no credence.

It is "well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) and citing *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140 (8th Cir. 1996) ("If [appellants] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm.")). "[D]isclosure requirements," moreover, "can chill association '[e]ven if there [is] no disclosure to the general public." *Ams. for Prosperity Found.*, 141 S. Ct. at 2388. From the Supreme Court's 1958 *NAACP* decision to its July 2021 *Americans for Prosperity Foundation* decision, the Court has repeatedly found that the precise sort of disclosure that Defendants illegally seek from WinRed can, and does, chill First Amendment associational privacy rights. Because this constitutional injury is indisputably irreparable, this factor favors issuance of a preliminary injunction.

### C. Balancing the equities favors issuance of a preliminary injunction.

Despite their protestations to the contrary, the Defendants have provided no reason why the equities favor immediate compliance with their subpoenas and CIDs, rather than allowing the Court to maintain the status quo while it sorts out the federal preemption questions at issue in this case. As discussed above, *see supra* Part II.B, the threats to

WinRed's constitutional rights and competitive interests are real and acute. In contrast, the Defendants' concerns regarding "ongoing and potentially unlawful conduct" ring particularly hollow given their decade-long delay in investigating ActBlue over purportedly similar concerns (and given the fact that WinRed is not responsible for the use of pre-checked boxes). *See* ECF No. 39, at 27. And in any event, the fact that users of WinRed's services have refunded money to some donors shows that there is little-to-no urgency driving the Defendants' joint investigation; if donors mistakenly authorize a recurring donation, they are frequently being made whole. Plainly, then, equity favors maintenance of the status quo during the pendency of this litigation.

### D. The public interest favors issuance of a preliminary injunction.

Finally, the public interest plainly favors issuance of an injunction. "[I]t is," of course, "always in the public interest to protect constitutional rights," *PhelpsRoper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), particularly those enshrined in the First Amendment, *see Child Evangelism Fellowship v. Elk River Area Sch. Dist. # 728*, 599 F. Supp. 2d 1136, 1141 (D. Minn. 2009). The Defendants have no response to this other than to continue insisting that their subpoenas impose no First Amendment threat. Respectfully, the U.S. Supreme Court disagrees, and this Court is bound to follow its *NAACP* and *Americans for Prosperity Foundation* decisions rather than the Defendants' *ipse dixit*.

Nor do they have a meaningful response to the havoc that their patchwork approach would inflict on the nationwide campaign-finance uniformity established by FECA. If their position is correct, it necessarily means that a person in Maryland who wishes to donate

13

money to the Republican Presidential candidate in 2024 will be subject to a different set of rules and regulations than an entirely similarly situated donor giving to the same candidate who happens to live across the State's border in West Virginia. Whereas ROSCA expressly invites this type of state-enforcement cornucopia, FECA expressly forbids it.

When it enacted FECA, Congress made a reasoned decision that the public interest would be best served by harmonizing and homogenizing federal campaign-finance regulation across all fifty states. Naturally, the public-interest prong takes into account the "purposes and interests" that FECA "was intended to serve." *See Branstad v. Glickman*, 118 F. Supp. 2d 925, 943 (N.D. Iowa 2000). Because the Defendants ask this Court, in so many words, to ignore the public-interest goals set by Congress in enacting FECA, this Court should decline the invitation and find instead that this factor favors issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant WinRed's motion for a preliminary injunction.

Dated: September 2, 2021

Respectfully Submitted,

*s/ Thomas H. Boyd*
Thomas H. Boyd (MN Bar No. 200517)
Kyle R. Kroll (MN Bar No. 398433)
WINTHROP & WEINSTINE, P.A.
3500 Cappella Tower
225 South Sixth Street
Minneapolis, MN 55402-4629
tboyd@winthrop.com
kkroll@winthrop.com
(612) 604-6400

--and--

Jason Torchinsky (DC Bar No. 976033)*
Edward M. Wenger (DC Bar No. 1001704)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N. Street N.W., Ste. 643-A
Washington, D.C. 20037
jtorchinsky@holtzmanvogel.com
emwenger@holtzmanvogel.com
(202) 737-8808
*Admitted *pro hac vice*

*Counsel for Plaintiff WinRed, Inc.*

22429069v1