**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

WINRED, INC,

                                                    Civil No. 21-1575 (JRT/BRT)

                              Plaintiff,

v.

                                                    **MEMORANDUM OPINION AND ORDER**
                                                    **GRANTING MOTION TO DISMISS AND**
KEITH ELLISON, *in his official capacity*,          **DENYING MOTION FOR PRELIMINARY**
LETITIA JAMES, *in her official capacity*,                        **INJUNCTION**
WILLIAM TONG, *in his official capacity*,
and BRIAN FROSH, *in his official capacity*,

                              Defendants.

---

Edward M. Wenger, **HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC**, 2300 N Street Northwest, Suite 643a, Washington, DC 20037; Jason Brett Torchinsky, **HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC**, 15405 John Marshall Highway, Haymarket, VA 20169; and Kyle R. Kroll and Thomas R. Boyd, **WINTHROP & WEINSTINE, PA**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402, for plaintiff.

Erin Elizabeth Conti, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1200, Saint Paul, MN 55101; James W. Canaday, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101; and Jason Marisam, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for Defendant Keith Ellison.

James W. Canaday, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101; and Jane Melissa Azia, Laura Levine, and Mark H. Ladov, **NEW YORK STATE ATTORNEY GENERAL'S OFFICE**, 28 Liberty Street, 20th Floor, New York, NY 10005, for Defendant Letitia James.

James W. Canaday, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101 and Jonathan Blake,

**CONNECTICUT ATTORNEY GENERAL'S OFFICE**, 165 Capitol Avenue, Hartford, CT 06115, for Defendant William Tong.

Andrea W. Trento, **MARYLAND ATTORNEY GENERAL'S OFFICE**, 200 Saint Paul Plaza, 20th Floor, Baltimore, MD 21202 and James W. Canaday, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101, for Defendant Brian Frosh.

WinRed, Inc. brought this action against Defendants William Tong, Brian Frosh, Keith Ellison, and Letitia James in their official capacities as the Attorneys General of Connecticut, Maryland, Minnesota, and New York, respectively. The Attorneys General initiated investigations of WinRed to determine if WinRed had violated each states' consumer protection statutes through the use of pre-checked recurring donation boxes on its website. WinRed seeks a declaratory judgment that the Federal Election Campaign Act ("FECA") preempts the relevant state laws with regards to WinRed's conduct and a permanent injunction enjoining the investigations and any enforcement action by the Attorneys General against WinRed in connection with the pre-checked recurring donation boxes.

After WinRed filed this case, the Attorneys General issued subpoenas to WinRed. WinRed moved for a preliminary injunction blocking enforcement of the subpoenas. The Attorneys General then filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) asserting that (1) the Court lacks personal jurisdiction over the Connecticut, Maryland, and New York Attorneys General and (2) WinRed's Complaint fails to state a viable claim upon which relief can be granted. The Court will grant the Motion

to Dismiss under Rule 12(b)(2) as to the Connecticut, Maryland, and New York Attorneys General because conspiracy-based personal jurisdiction does not apply to this case. The Court will also grant the Motion to Dismiss as to Minnesota's Attorney General because FECA does not preempt the applicable state laws. The Court will deny WinRed's Motion for a Preliminary Injunction as moot.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Plaintiff WinRed is a federal political action committee incorporated in Delaware with its principal place of business in Virginia. (Compl. ¶ 8, July 7, 2021, Docket No. 1.) It assists the fundraising efforts of candidates, parties, and political committees affiliated with the Republican Party. (*Id.* ¶¶ 6, 8.) It does this by accepting contributions from donors that are earmarked for candidates and other committees and then passing those contributions along to the earmarked candidate, party unit, or committee. (*Id.*)

The Defendants are the Attorneys General of four states—Connecticut, Maryland, Minnesota, and New York—who are named as defendants in their official capacities only. (*Id.* ¶¶ 9–12.) Each is responsible for administering their states' respective consumer protection laws. (*Id.*)

WinRed's Complaint alleges that its sole activities are related to accepting and distributing contributions for federal office. (*Id.* ¶ 6.) It accepts earmarked donations

from donors across the United States.  (*Id.* ¶ 8.)  WinRed is federally registered with the Federal Election Commission ("FEC").  (*Id.* ¶ 4.)

Allegedly, WinRed's fundraising platform sometimes uses pre-checked recurring donation boxes which sign the donors up to make repeated donations rather than a single donation.  (Compl., Ex. A at 2, July 7, 2021, Docket No. 1-1.)  While some donors may intend to make recurring donations, others have allegedly been charged for multiple contributions even though they intended to only make a one-time contribution.  (*See id.*)

After news reports surfaced of WinRed's alleged practice, the Attorneys General began investigating WinRed to determine if WinRed's practices are illegal.  (*Id.*)  The Attorneys General allege that various state and federal laws require "clear and conspicuous disclosures to consumers before an automatic renewal or additional purchase can take effect, and define the failure to do so as a deceptive practice."  (*Id.*)

On April 29, 2021, the New York Attorney General's office sent WinRed a letter on behalf of all four Attorneys General.  (Compl. ¶ 35; Compl. Ex. A.)  To assist the investigations, the letter requests WinRed provide the Attorneys General with various information including WinRed's organizational structure; clients who have used pre-checked recurring donation boxes; complaints about recurring donations from Connecticut, Maryland, Minnesota, and New York residents; refunds provided to residents of those states; policies concerning pre-checked recurring donation boxes; internal and external communications about the boxes; and all examples of pre-checked

solicitation pages.  (Compl. ¶ 39; Compl. Ex. A at 2–3.)  The letter requests a response by May 17, 2021.  (Compl., Ex. A at 4.)

On June 1, 2021, WinRed responded to the letter by refusing to comply with the requests because WinRed asserted the relevant state consumer protection laws and the investigations are preempted by FECA.  (Compl. ¶ 40; Compl. Ex. B at 6–8.)  The Attorneys General responded on June 17, 2021 that the laws and the investigations are not preempted by FECA and renewed their request for information and documents with a deadline of June 30, 2021.  (Compl. ¶ 41; Compl. Ex. C at 10–12.)  On June 30, 2021, WinRed reasserted its preemption position and provided only copies of FEC filings that were already publicly available.  (Compl. ¶ 42; Compl. Ex. D at 14.)

## II.   PROCEDURAL HISTORY

On July 7, 2021, WinRed brought this action against the Attorneys General seeking a declaratory judgment that the state consumer protection laws at issue and investigations under them are preempted "with respect to" fundraising for federal elections by FECA and the FEC regulations promulgated under FECA.  (Compl. ¶¶ 46, 48, 58, 60, 68, 70.)  WinRed asks the Court to permanently enjoin the Attorneys General from investigating or taking enforcement action against WinRed with respect to its online fundraising practices under the state consumer protection laws.  (Compl. at 14.)

On July 16, 2021, the Attorneys General issued subpoenas and civil investigative demands to WinRed demanding compliance with the document and information requests

by August 16, 2021. (Decl. of Gerrit Lansing, Exs. 1–4, July 27, 2021, Docket No. 24-1.) WinRed filed a Motion for a Preliminary Injunction asking the Court to enjoin enforcement of the subpoenas and demands. (Mot. Preliminary Injunction, July 27, 2021, Docket No. 20.) The Attorneys General oppose the Preliminary Injunction but agreed to stay enforcement of the subpoenas and demands and to delay action pending resolution of the Motion. (Mem. Opp. Preliminary Injunction, Aug. 19, 2021, Docket No. 39; Stip. ¶ 4, July 29, 2021, Docket No. 29.)

On July 29, 2021, the Attorneys General filed a Motion to Dismiss WinRed's case asserting the Court lacks personal jurisdiction over the Connecticut, Maryland, and New York Attorneys General and the Complaint fails to state a claim upon which relief may be granted. (Mot. Dismiss, July 29, 2021, Docket No. 31.) WinRed opposes both grounds for the Motion to Dismiss. (Mem. Opp. Mot. Dismiss, Aug. 19, 2021, Docket No. 44.)

## DISCUSSION

### I.   PERSONAL JURISDICTION

#### A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(2) provides that a party may move to dismiss claims for lack of personal jurisdiction. To survive a 12(b)(2) motion to dismiss, the plaintiff must plead sufficient facts to support a reasonable inference that the defendant can be subjected to personal jurisdiction. *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015). The plaintiff bears the burden of establishing personal

jurisdiction. *Id.* At this stage, the case should not be dismissed "if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id.*

**B.     Analysis**

The Court may exercise personal jurisdiction over a defendant in this federal question case only if doing so (1) is consistent with Minnesota's long-arm statute, Minn. Stat. § 543.19, and (2) comports with due process. *See Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)).[1]   Minnesota's long-arm statute reaches as far as the Constitution allows. *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.*, 63 F.3d 694, 697 (8th Cir. 1995); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 29 (Minn. 1995).

Only the Attorneys General from Connecticut, Maryland, and New York move for dismissal based on lack of personal jurisdiction.[2]   (*See* Mem. Supp. Mot. Dismiss at 12, July 29, 2021, Docket No. 34.)  They argue the Court lacks general personal jurisdiction as the Complaint fails to allege that they have sufficient continuous or systematic contacts with Minnesota to render them at home here.  As for specific personal jurisdiction, they

---

[1] There is, however, no need to consult Minnesota state law to determine the Court's personal jurisdiction if the case arises from a federal statute that directs otherwise.  Fed. R. Civ. P. 4(k)(1)(C); *see also Kedrowski v. Richards*, No. 20-193, 2020 WL 5253869, at *5 (D. Minn. Sept. 3, 2020), *aff'd*, No. 20-3067, 2021 WL 1410910 (8th Cir. Feb. 12, 2021).

[2] It is undisputed that the Court has personal jurisdiction over the Minnesota Attorney General.

contend it is lacking because the Complaint fails to allege that they purposefully availed themselves of the benefits and protections of Minnesota law or that they directed their activities at Minnesota that had effects in Minnesota in connection with WinRed's cause of action. WinRed does not dispute these arguments. Instead, it only contends the Court has personal jurisdiction because Minnesota recognizes conspiracy-based personal jurisdiction and the Attorneys Generals' actions meet the elements under Minnesota law.

Courts in this District have held on multiple occasions that the Minnesota Supreme Court recognized conspiracy-based personal jurisdiction in *Hunt v. Nevada State Bank*, 172 N.W.2d 292 (Minn. 1969). *E.g.*, *ASI, Inc. v. Aquawood, LLC*, No. 19-763, 2020 WL 5913578, at *6 (D. Minn. Oct. 6, 2020); *DURAG Inc. v. Kurzawski*, No. 17-5325, 2020 WL 2112296, at *5 (D. Minn. May 4, 2020) (collecting cases); *Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 864 (D. Minn. 2014); *Peterson v. Wallace*, 622 F. Supp. 2d 791, 800 (D. Minn. 2008); *Personalized Brokerage Servs., LLC v. Lucius*, No. 05-1663, 2006 WL 208781, at *5 (D. Minn. Jan. 26, 2006).

WinRed and courts in this District typically frame Minnesota's conspiracy-based personal jurisdiction as requiring a showing that (1) a conspiracy existed, (2) the non-resident defendant participated in or joined the conspiracy, and (3) an overt act was taken in furtherance of the conspiracy within Minnesota's borders. *E.g.*, *DURAG*, 2020 WL 2112296, at *5; *Yellow Brick Rd.*, 36 F. Supp. 3d at 864. WinRed contends the Complaint establishes a prima facie case of these three elements. On the first element, WinRed

asserts that a conspiracy exists because the Attorneys General worked in concert to commit an illegal act. According to WinRed, if the investigation and the state laws are preempted by federal law (as the Complaint asserts), then the Attorneys General have jointly committed an unlawful act because their actions exceed their lawful power. On the second element, WinRed contends the non-Minnesota Attorneys General participated in and joined the conspiracy through the joint drafting and sending of the demands to WinRed. Finally on the third element, WinRed argues it is met because a member of the conspiracy—the Minnesota Attorney General—took actions in furtherance of the joint investigation in Minnesota.

The third element of conspiracy-based personal jurisdiction contains somewhat more nuance than that applied by WinRed. This nuance precludes the Court from exercising personal jurisdiction through conspiracy-based jurisdiction over the non-Minnesota Attorneys General. Properly understood, the third element of conspiracy-based personal jurisdiction requires that the harm of the overt act taken in furtherance of the conspiracy **be directly felt within Minnesota's borders**. There are several reasons this is the correct understanding of the third element.

First, *Hunt* indicates that the effect of the conspiracy must be directly felt within Minnesota. Although courts applying *Hunt* have derived three elements of conspiracy-based jurisdiction, *Hunt* itself does not lay out these elements as cleanly. *See Hunt*, 172 N.W.2d at 311–13. When describing the overt act and the effect of the conspiracy, *Hunt*

repeatedly explains that the basis for conspiracy-based jurisdiction is its effect in Minnesota and on Minnesotans.  The *Hunt* Court holds that physical presence of a conspirator in Minnesota is not necessary "[o]nce participation in a tortious conspiracy—**the effect of which is felt in this state**—is sufficiently established."  *Id.* at 311 (emphasis added).  It justifies conspiracy-based jurisdiction by asserting that it would be fair for a defendant to defend itself in Minnesota against "an action based on **injury to our citizens**," when the result of a defendant's conduct "is **injurious to numerous Minnesotans**," or when a defendant took intentional actions, "the inescapable effect of which is to **injure Minnesotans**."  *Id.* at 312 (emphasis added).  *Hunt* never states that Minnesota's conspiracy-based jurisdiction applies simply because any overt act in furtherance of the conspiracy occurs in Minnesota.  Instead, it applies only when the harm of the overt act occurs in Minnesota.

Second, although it appears that courts have not typically explicitly laid out this clarification of the third *Hunt* element, courts have suggested that the best interpretation of *Hunt* cannot employ the broader understanding of the third element that only requires the showing of any overt act in Minnesota.  In *Peterson*, for example, the court suggested conspiracy-based jurisdiction applies when activities take place within Minnesota, "thereby causing harm **within the state**."  *Peterson*, 622 F. Supp. 2d at 801 (emphasis added).  In *ASI*, the court noted that *Hunt* could also be interpreted as applying a form of the *Calder* effects test.  *ASI*, 2020 WL 5913578, at *6 n.4.  The *Calder* effects test requires

that "the defendant's acts (1) were intentional, (2) were uniquely or expressly **aimed at the forum state**, and (3) **caused harm, the brunt of which was suffered**—and which the defendant knew was likely to be suffered—**[in the forum state]**." *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010) (emphasis added) (alteration in original).  Thus, courts discussing Minnesota conspiracy-based jurisdiction, whether as an alternative theory of personal jurisdiction or as an adaptation of the *Calder* effects test, have previously raised this nuance.

Moreover, in the cases where courts have held conspiracy-based jurisdiction exists and provides them personal jurisdiction over the defendants, it was evident that the alleged harm was directed at Minnesota and Minnesotans.  *See, e.g.*, *ASI*, 2020 WL 5913578, at *6–7 (conspiracy that included sham motion to intervene and false affidavits filed in a court in Minnesota and fraudulent transactions with a Minnesota company); *DURAG*, 2020 WL 2112296, at *1, 6 (conspiracy to create a company in Minnesota that violated the duties owed to a Minnesota corporation); *Lucius*, 2006 WL 208781, at *1, 3–5 (conspiracy to breach duties and usurp business opportunities arising from alleged failure to report activities to a corporate board in Minnesota and allegedly unlawfully competing for business in Minnesota).  In *Hunt* itself, "the ultimate injury was to creditors and policyholders of [a defendant company], most of whom are admittedly Minnesotans."  *Hunt*, 172 N.W.2d at 308 n.28.  It was therefore unnecessary for the court

in these cases to explicitly address the issue discussed herein as the complaints indisputably alleged direct harm **in Minnesota and to Minnesotans**.

Third, applying this nuance, to some extent, alleviates the concern that conspiracy-based personal jurisdiction is susceptible of abuse. *See DURAG*, 2020 WL 2112296, at *5–6. In conspiracy law, the "overt act" requirement is generally quite capacious. *See, e.g., United States v. Crippen*, 627 F.3d 1056, 1065 (8th Cir. 2010). For example, a "discussion of how to achieve the purpose of an agreement constitutes an overt act in furtherance of the agreement, and more specifically, telephone conversations in which plans and arrangements are made in furtherance of the conspiracy are overt acts." *Id.* (cleaned up). While these overt acts may be sufficient to establish a defendant's **liability** for a conspiracy, it is a separate question whether any minor overt acts by any coconspirator is sufficient to establish **personal jurisdiction** over every coconspirator in every district where any overt act took place. If the effect of the conspiracy need not be directly felt in Minnesota, it would greatly expand the potential to abuse conspiracy-based jurisdiction. For example, under this expansive approach, if an employee of a different state's Attorney General participated in a telephone conversation while passing through Minnesota, Minnesota could obtain personal jurisdiction over the entire conspiracy even if the Minnesota Attorney General's office was uninvolved. Here, limiting conspiracy-based jurisdiction only to harms directed at Minnesotans alleviates this concern and decreases the risk of abuse.

Fourth, applying a limit requiring that Minnesotans be directly harmed ensures that conspiracy-based personal jurisdiction comports with due process. For a court to constitutionally exercise personal jurisdiction over the defendant, due process requires a defendant to have sufficient minimum contacts with the forum state demonstrating that the defendant has purposefully availed itself of the benefits and protections of said forum state. *Johnson*, 614 F.3d at 794. These contacts may establish general or specific jurisdiction. *Id.* A court has general jurisdiction where the defendant is at home or is "fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). To establish this, a defendant must have "continuous and systemic" contacts with the forum state. *Johnson*, 614 F.3d at 794. A court can exercise specific personal jurisdiction, however, only if the case arises out of the defendant's contacts with the forum. *Bristol-Myers Squibb Co. v. Superior Ct. of Ca.*, 137 S. Ct. 1773, 1780 (2017). Nevertheless, any minimal contact with the forum that is in some way connected with the cause of action still may be insufficient to establish specific personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985). Instead, "[s]pecific jurisdiction over a defendant is exercised when a state asserts personal jurisdiction over a nonresident defendant that **has purposefully directed its activities at [the forum-state's] residents** in a suit that arises out of or relates to these activities." *Johnson*, 614 F.3d at 794 (cleaned up) (emphasis added).

In the Eighth Circuit, courts must consider five factors when determining whether they have personal jurisdiction: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum-state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Id.* Courts look at the factors in the aggregate and consider the totality of the circumstances when assessing personal jurisdiction. *Id.* The third factor distinguishes between whether the personal jurisdiction to be exercised is general or specific. *Id.* When evaluating specific jurisdiction, these factors essentially boil down to three considerations: (1) whether the quality and quantity of the defendant's contacts with the forum state establish minimum contacts; (2) whether the litigation arises out of those contacts; and finally, if the first two are met, (3) whether it is reasonable, considering the interest of the forum state and convenience to the parties, to force an out-of-state litigant to defend itself in the forum state. *See* 13 Wright & Arthur R. Miller, Federal Practice and Procedure § 1069 (4th ed.).

If a plaintiff seeks to establish jurisdiction via conspiracy-based jurisdiction, the defendant is necessarily not "at home" in the forum as doing so would be unnecessary. Therefore, to comport with due process, the suit must arise out of activities directed at the forum's residents. Without requiring a direct harm in Minnesota or to Minnesotans, conspiracy-based jurisdiction could be established based upon a single, minor contact that Minnesota has little interest in providing a forum for even when it is inconvenient to

the parties.  This is constitutionally insufficient to establish jurisdiction.  By requiring a direct harm to Minnesotans for jurisdiction to attach, conspiracy-based jurisdiction complies with personal jurisdiction's due process requirements.[3]

In sum, the third element of Minnesota's conspiracy-based jurisdiction, properly understood, requires a plaintiff to allege two place-based facts: (1) an overt act occurred in Minnesota and (2) a harm of this overt act was directly felt by Minnesotans.

WinRed has not made a prima facie showing that the harms of the alleged conspiracy will be directly felt by Minnesotans.  The Complaint does not allege that the efforts it must undertake to comply with the requests for information from the Attorneys General will occur in Minnesota or directly harm Minnesotans.  WinRed is a citizen of Delaware and Virginia, not Minnesota.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010).  Therefore, even if the other elements of conspiracy-based jurisdiction are properly alleged,[4] the Complaint does not adequately plead that the Court has conspiracy-based

--------------------

[3] For similar reasons, requiring a direct harm to Minnesotans is also more consistent with Minnesota's long-arm statute.  The statute provides that a Minnesota court has personal jurisdiction over a foreign defendant if the defendant commits an act outside of Minnesota that causes injury in Minnesota but that Minnesota still may lack jurisdiction if "Minnesota has no substantial interest in providing a forum."  Minn. Stat. 543.19, subd. 1(4).  If the direct harms of the conspiracy are not felt by Minnesotans, Minnesota likely has no substantial interest in providing a forum, even if there are incidental, indirect harms in Minnesota.

[4] The Attorneys General also assert that conspiracy-based jurisdiction is inapplicable because (1) conspiracy-based jurisdiction requires an underlying tort and there is not as the Attorneys General's actions are lawful and, (2) even if they are unlawful, conspiracy-based jurisdiction requires an actionable tort and there is not one here since prosecutorial immunity would shield the Attorneys General from such a claim.  Because the Court finds that conspiracy-based jurisdiction does not attach on separate grounds, the Court need not resolve these issues.

personal jurisdiction over the non-Minnesota Attorneys General.[5]  Because WinRed does

not argue that the Court has personal jurisdiction on any other basis, the Court will grant

the motion to dismiss the case against the Connecticut, Maryland, and New York

Attorneys General for lack of personal jurisdiction.[6]

--------

[5] WinRed also contends that declining to find personal jurisdiction here may require parties subject to collaborative investigations by multiple state attorneys general to seek recourse in multiple jurisdictions if the investigations are preempted by federal law leading to a waste of resources.  The personal jurisdiction analysis, however, does not focus on judicial resources or plaintiffs' resources.  The primary concern is "the burden on the defendant." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  There is no exception for cases brought against state attorneys general.  Finding jurisdiction here would impose a burden on the non-Minnesota Attorneys General to litigate a case away from their home states.

Finding jurisdiction here would result in other ramifications as well.  State attorneys general may avoid future collaborative investigations in order to limit the number of districts with personal jurisdiction.  This would increase the burden on entities being investigated as they would be forced to respond to multiple letters with different requests, and it would increase the burden on state attorneys general who would be less likely to pool limited investigative resources.  It could also prevent state attorneys general from identifying and addressing common problems throughout the country.  Opening this path to specific personal jurisdiction could place other burdens on judicial resources as courts wade into how much coordination between attorneys general is sufficient to establish jurisdiction.

WinRed did not identify controlling case law that state attorneys general can be fairly haled into a state anytime they contact that state's attorney general about a common investigative target.  In sum, while declining to find personal jurisdiction in this and similar cases may inconvenience WinRed and future plaintiffs, this inconvenience and possible waste of resources is insufficient to overcome defendants' due process rights and other relevant considerations.

[6] WinRed requested "the opportunity to conduct jurisdictional discovery to fully ascertain the level of coordination between" the Minnesota Attorney General and the non-Minnesota Attorneys General.  (Mem. Opp. Mot. Dismiss at 5.)  A district court has the discretion to allow limited jurisdictional discovery on a motion to dismiss for lack of personal jurisdiction if ascertaining additional facts will help resolve the jurisdictional issue.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978).  A court should generally permit such discovery when a plaintiff "offer[s] documentary evidence, and not merely speculations or conclusory allegations" regarding a defendant's contact with the forum.  *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008).  Jurisdictional discovery, however, is unwarranted when even if the allegations

## II.    FAILURE TO STATE A CLAIM

Because it is undisputed that the Court has personal jurisdiction over the Minnesota Attorney General, the Court must now address the Attorneys General's Rule 12(b)(6) Motion to Dismiss for failure to state a claim.

### A.    Standard of Review

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint

---

were proven it would still be insufficient to support personal jurisdiction. *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011).

Like *Viasystems*, this is not a case where the facts necessary to resolving the jurisdictional issue are unknown or disputed. *See id.* WinRed's conspiracy-based jurisdictional argument fails as a matter of law, not because it and the Court lack sufficient facts. Even assuming a maximum level of coordination, WinRed's conspiracy-based jurisdictional theory fails because the harms of the alleged conspiracy are not directed at Minnesota or Minnesotans. The facts that WinRed is the target of the investigations and is not a Minnesota resident are not in dispute. Although the Court does not resolve the Attorneys Generals' other arguments against conspiracy-based jurisdiction, these issues are also legal, not factual questions that could be resolved by jurisdictional discovery.

Because WinRed does not contend that the Court has personal jurisdiction under any other theory and has not provided other documentary evidence in support of jurisdiction that suggests discovery will demonstrate facts sufficient to constitute a basis for jurisdiction, the Court will deny WinRed's request to conduct jurisdictional discovery.

The Court also notes that on the same day WinRed filed its opposition to the Motion to Dismiss, the Attorneys General filed affidavits with facts relevant to jurisdictional issues. (Decl. of James Canaday, Aug. 19, 2021, Docket No. 40; Decl. of Mark Ladov ("Ladov Decl."), Aug. 19, 2021, Docket No. 41; Decl. of Jonathan Blake, Aug. 19, 2021, Docket No. 42; Decl. of Philip Ziperman, Aug. 19, 2021, Docket No. 43.) Although the Court does not base its holding that conspiracy-based jurisdiction does not apply in this case on these affidavits, they provide further support that the Court lacks personal jurisdiction over the non-Minnesota Attorneys General. They support a conclusion that the non-Minnesota Attorneys General are not at home in Minnesota for general jurisdiction. (*See, e.g.*, Ladov Decl. ¶¶ 2–8.) And they support a conclusion that the claims against the non-Minnesota Attorneys General do not arise from contacts they had with Minnesota sufficient to support specific jurisdiction. (*See, e.g.*, *id.* ¶¶ 10–14.)

states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes the complaint in the light most favorable to the plaintiff, accepting the complaint's factual allegations as true and drawing all inferences in the plaintiff's favor. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018); *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). In other words, a complaint "does not need detailed factual allegations" but must include "more than labels and conclusions, and a formulaic recitation of a cause of action's elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

In reviewing a motion to dismiss, the Court may consider the allegations made in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

### B.    Analysis

WinRed's Complaint asserts that FECA preempts the state consumer protection laws that are the basis for the Attorneys Generals' investigations because WinRed is a federally regulated political committee registered with the FEC. It contends that FECA

preempts the consumer protection laws based on three different types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption.

Under the Supremacy Clause of the Constitution, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  In other words, "state laws that conflict with federal law are without effect."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quotation omitted).  "The purpose of Congress is the ultimate touchstone in every pre-emption case."  *Id.* (cleaned up).

The Court begins its "analysis with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Id.* at 77 (cleaned up).  This presumption "applies with particular force" when a party seeks to apply preemption "in a field traditionally occupied by the States."  *Id.*  This principle is particularly important here as regulating unfair business practices and protecting consumers from deception are areas traditionally regulated by the states. *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963).  Minnesota's Attorney General initiated its investigation pursuant to his authority under Minnesota Statutes § 8.31 seeking to enforce Minnesota Statutes §§ 325D.44 and 325F.69.  (Compl., Ex. C at 1 n.1.) These laws are laws of general applicability that target deceptive trade practices, without singling out political campaigns.

Courts have recognized the three types of preemption WinRed argues apply: express, field, and conflict preemption. *Altria Grp.*, 555 U.S. at 76. If any of the three apply, the Court must deny the Motion to Dismiss.

### 1. Express Preemption

FECA contains an express preemption clause codified at 52 U.S.C. § 30143.[7] If a federal law contains an express preemption clause, it does not immediately end the inquiry, as a court must still determine "the substance and scope" of the express preemption clause. *Altria Grp.*, 555 U.S. at 76. In fields of traditional state regulation, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Id.* at 77 (quotation omitted). Therefore, there is a "strong presumption against preemption" and courts narrowly construe the language of FECA's preemption clause. *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993) (applying FECA's preemption clause).

The relevant portion of FECA's preemption clause reads: "the provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a).[8] The committee of the House of Representatives that wrote FECA noted that with the preemption provision "[i]t

---

[7] FECA's preemption clause was formerly codified at 2 U.S.C. § 453. Older cases refer to 2 U.S.C. § 453 instead of 52 U.S.C. § 30143. The preemption clause itself is unchanged.

[8] It is undisputed that the limitation on preemption in 52 U.S.C. § 30143(b) is inapplicable here.

is the intent of the Committee to preempt all state and local laws. . . . It is the intent of the committee to make certain that the Federal law is construed to occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated." H.R. Rep. No. 93-1239, at 10 (1974).

For its part, the FEC has clarified that FECA and FEC regulations preempt state law concerning the "(1) Organization and registration of political committees supporting Federal candidates; (2) Disclosure of receipts and expenditures by Federal candidates and political committees; and (3) Limitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b). The FEC has specifically listed certain state laws that are not preempted including those concerning the "(1) Manner of qualifying as a candidate or political party organization; (2) Dates and places of elections; (3) Voter registration; (4) Prohibition of false registration, voting fraud, theft of ballots, and similar offenses; (5) Candidate's personal financial disclosure; or (6) Application of State law to the funds used for the purchase or construction of a State or local party office building[.]" *Id.* § 108.7(c).

FECA, therefore, expressly preempts some state laws, and the Court must now determine whether it preempts the state consumer protection laws at issue here. FECA preempts "any provision of State law with respect to election to Federal office." Thus, whether a state law is expressly preempted turns on what Congress meant by "with respect to." The parties urge the Court to apply this phrase to reach different amounts

-21-

of activity.  WinRed argues that, as a federal conduit PAC, all its activity is "with respect

to" federal elections and is thus preempted.[9]   The Attorneys General argue FECA's

preemption is narrower.  They suggest that if the FEC does not have the power to

proscribe an activity, it is beyond FECA's express preemptive scope.  Although the Court

_____

[9] WinRed asserts that "its activities are directed entirely at accepting and distributing earmarked contributions for federal offices."  (Compl. ¶ 6.)  The Attorneys General dispute this claim noting that WinRed's website solicits donation for state races including parties, candidates, and committees in every state.  (Mem. Supp. Mot. Dismiss at 2–3.)  A cursory look at www.winred.com confirms that this website is used to fundraise for non-federal elections including in Connecticut, Maryland, Minnesota, and New York.

WinRed claims that it is improper for the Court to consider the website contents at this stage.  WinRed is correct that reliance on materials outside the pleadings is typically inappropriate on a motion that focuses on the sufficiency of a complaint.  The Court, however, may consider the website.  Because the dispute here arises out of WinRed's conduct on this website, similar to a contract dispute which will consider the contract, the Complaint necessarily embraces the website, and it may be considered.   *See Schriener*, 774 F.3d at 444.  Furthermore, a court may take judicial notice of facts in the public record without converting a motion to dismiss into a summary judgment motion.  *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).  Therefore, the Court may take judicial notice of information contained on the website WinRed itself alleges it uses for all its activity.  *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-3580, 2007 WL 892517, at *4 n.5 (D. Minn. Mar. 21, 2007); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (cleaned up)).

Although the Court concludes that the investigations are not preempted without reference to WinRed's website, the website supports the conclusion that the investigations are not preempted in their entirety.  FECA only preempts state laws "with respect to election to Federal office," 52 U.S.C. § 30143(a), and does not preempt state laws with respect to election to state office.  The FEC has similarly adopted the view that state regulation of federal political committees' non-federal activity is permissible even if regulation of the same federal activity would otherwise be preempted.  *E.g.*, FEC Adv. Op. 1986-27 (Aug. 21, 1986) ("The Act does not, however, preempt state law with respect to the reporting of receipts and disbursements of funds used for non-Federal election purposes[.]").  To the extent that WinRed, its agents, or its resources are engaged in any non-federal election activity, the investigations are not preempted as to this activity and therefore the full relief WinRed requests—completely enjoining the investigations—is overbroad.

need not determine exactly where the express preemptive line is, it is somewhere between these two approaches, and it does not preempt the state consumer protection laws at issue here.  This is so for several reasons.

First, as with any preemption analysis, the touchstone is Congressional intent.  The language of § 30143(a) is broad.  FECA, however, is a law concerned solely with federal elections and campaign finance, and § 30143 limits itself to this scope by only preempting laws "with respect to" federal elections.  The text of the preemption clause and of FECA generally does not evince an intent to preempt consumer protection laws even as applied to federal political committees.  The Committee Report and debates over the preemption provision further support this conclusion regarding Congress's intent.  They demonstrate that Congress's purpose for adding the preemption clause was to eliminate issues such as (1) federal committees being required to file different and sometimes conflicting campaign finance reports with both the federal and state governments and (2) federal committees complying with different dollar limits on contributions and expenditures depending on the state.  *See* H.R. Rep. No. 93-1239, at 10 (1974); 120 Cong. Rec. 27460–65 (1974).  The Conference Report on this provision clarified that state laws relating "to registration, reporting, and disclosure requirements for Federal elections are preempted" and FECA "occupies the field with respect to reporting and disclosure of political contributions to and expenditures by Federal candidates and political committees."  H.R. Rep. 93-1438, at 100–01, 125 (1974) (Conf. Rep.).  In sum, the purpose was to expressly

preempt laws that directly regulate political campaign contribution and expenditure limits and reporting and disclosure requirements, not laws of general applicability whenever they happened to apply to a federal political committee.[10]

Second, the limit on FECA's preemptive reach can also be seen through the FEC's preemption regulation.  There are three topics this regulation expressly provides that federal law preempts state law: issues dealing with (1) organization and registration of federal political committees; (2) disclosure of receipts and expenditures; and (3) limitations on contributions and expenditures.  11 C.F.R. § 108.7(b).  The first two issues mentioned by this regulation breaks Congress's first concern into two discrete parts with the third capturing Congress's second concern.  It again does not touch laws of general applicability, like consumer protection laws, that are not aimed at these concerns.  FEC regulations do not address the concerns state consumer protection and deceptive trade practices laws are meant to curtail.

Finally, it is untenable that Congress intended the practical effect of preempting all state laws if the activity is somehow connected to federal elections.  WinRed contends that because its sole activity is with respect to federal elections, the investigation is

---

[10] Congress did not even intend to preempt all laws that directly regulate the campaign finance process.  For example, its preemptive scope was not meant to apply to certain direct political activities including for example "any State law regulating the political activities of State and local officers and employees."  H.R. Rep. 93-1438, at 102 (1974) (Conf. Rep.); *see also Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545–46 (8th Cir. 1984) (holding that FECA does not preempt a state law limiting contributions to federal candidates for office by state public employees).

necessarily preempted.  Taken at its extreme, this would have the Court find that FECA preempts state employment or labor laws as applied to any entity that solely engages in federal elections because all their activity would be "with respect to" federal elections. Such an interpretation stretches FECA's preemption clause beyond its express bounds. FECA is not meant to regulate all activities by federal candidates and committees.  *See Orloski v. Fed. Election Comm'n*, 795 F.2d 156, 163–64 (D.C. Cir. 1986)

FECA's primary purpose is "to limit the actuality and appearance of corruption" in federal politics and elected office. *Buckley v. Valeo*, 424 U.S. 1, 26 (1976); *see also Orloski*, 795 F.2d at 163 ("The purposes of the Act are to limit spending in federal election campaigns and to eliminate the actual or perceived pernicious influence over candidates for elective office that wealthy individuals or corporations could achieve by financing the 'political warchests' of those candidates.").  It does this by regulating campaign contributions, expenditures, reporting, and disclaimers.  *See, e.g.*, 52 U.S.C. §§ 30101, 30104, 30116, 30120(a).  Not by regulating trade practices generally.

Therefore, in accordance with the command to narrowly construe FECA's preemptive section, *Weber*, 995 F.2d at 875, "with respect to" means that FECA expressly preempts laws that directly affect the responsibility to register with the FEC, to disclose receipts and expenditures, limitations on those receipts and expenditures, and other laws directly related to FECA's purpose.  FECA does not expressly preempt state laws of general applicability merely because those laws are applied to committees whose sole activities

are directed at federal elections.  Although nothing in the legislative history explicitly leaves consumer protection outside the preemptive scope, the command to narrowly construe FECA and the fact that consumer protection is an area of traditional state regulation demonstrate that Congress did not intend to preclude state enforcement of state consumer protection laws against federal political committees.

The cases WinRed cites and other cases support this conclusion.  In the cases where a state law is preempted, the state law directly regulated or affected the raising and spending of funds for campaign activity or disclosures of campaign contributions and expenditures.  For example, FECA preempted a state law specifically designed to **limit campaign expenditures** by federal candidates for office.  *Weber v. Heaney*, 995 F.2d 872, 873–76 (8th Cir. 1993); *see also Teper v. Miller*, 82 F.3d 989, 994–95 (11th Cir. 1996) (preempting a state campaign finance law whose purpose was similar to FECA's because it attempted to regulate the time of year a federal candidate could accept **political contributions**); *Bunning v. Kentucky*, 42 F.3d 1008, 1012–13 (6th Cir. 1994) (preempting a state campaign finance-related law used to require **additional disclosure of a federal candidate's political expenditures** where the state could not point to state law violated by the expenditure).  On the other hand, when analyzing preemption of "a general state law that happens to apply to federal political committees," courts "have rejected express preemption arguments and construed [§ 30143] narrowly."  *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013); *see, e.g., id.* at 200–

01 (use of state Uniform Fraudulent Transfer Act to recover contributions not preempted); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280–81 (5ᵗʰ Cir. 1994) (state laws on personal liabilities for debts associated with federal committee expenditures not preempted); *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 (2d Cir. 1991) (state cause of action based on corporate directors' duties not preempted because "Congress did not intend to preempt state regulation with respect to non-election-related activities").  Indeed, the Eighth Circuit has held that FECA has a narrow preemptive scope even for certain state regulations aimed directly at election-related fundraising and activities.  *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545–46 (8ᵗʰ Cir. 1984) (ban on political contributions by public employees not preempted).  In short, when a state law is "more tangential to the regulation of federal elections," § 30143 does not preempt it merely because it touches a federal committee.  *Teper*, 82 F.3d at 995.

In sum, state consumer protection laws and investigations instigated under them are not state laws that regulate "with respect to" federal elections.  They do not directly affect the conduct of elections or campaign fundraising and spending nor are they laws meant to regulate elections in particular.  They do not seek to limit contributions or expenditures—the types of laws that are regularly preempted.[11]  *See Weber*, 995 F.2d at

---

[11] The Complaint does not allege that the state laws would limit any contributions including recurring contributions, and therefore it does not allege that the state laws improperly limit political contributions.  Instead, the Complaint alleges the state laws may affect the process by which recurring contributions are initiated.

873–76; *Teper*, 82 F.3d at 995.  Instead, they are laws within fields that states traditionally exercise their police power to protect their residents and consumers from deceptive practices while still allowing federal political committees to raise and spend as much money as is permitted under federal law.  Nothing in the text, legislative history, or case law indicates that FECA expressly preempts the relevant state laws or investigations.

### 2. Field Preemption

WinRed next claims that implied field preemption applies.[12]  Even if a federal statute does not expressly preempt a state law, it may do so through field preemption "when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  The critical question is whether the "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) (quotation omitted).  Because Congress has not occupied the relevant field with regard to the consumer protection laws and because of the narrowness of FECA's preemptive scope, field preemption also does not apply here.

---

[12] The Court notes that the presence of an express preemption clause can support an inference that there is no additional implied preemptive reach of the statute.  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995).  Although this inference further supports the conclusion that FECA does not impliedly preempt—whether through field or conflict preemption—the laws at issue, even without this inference, the Court concludes the laws are not impliedly preempted.

WinRed contends that because FECA and the FEC have regulated disclosures and warnings on political advertisements, recurring payments, credit card payments, and online contributions, *see, e.g.*, FEC Adv. Op. 1981-27 (July 2, 1981); FEC Adv. Op. 1989-26 (Dec. 1, 1989); FEC Adv. Op. 1995-09 (Apr. 21, 1995); FEC Adv. Op. 2019-04 (Apr. 11, 2019), that federal law occupies the field.  FECA and FEC regulations do, as the House Committee Report stated, "occupy the field with respect to elections to Federal office." H.R. Rep. No. 93-1239, at 10 (1974).  But the Attorneys General's investigations were launched under generally applicable consumer protection laws.  FECA does not occupy the field of consumer protection.  Therefore, even if the FEC regulates some aspects of the fundraising instruments at stake in the investigations that does not mean FECA and FEC regulations have occupied the field if the use of these instruments violates consumer protection laws.

Nor does FECA occupy a field whenever a federal political committee enters that field.  Although FECA "establishes a comprehensive regime of limitations on campaign contributions and expenditures and extensive disclosure requirements" such that it occupies the field of federal elections, the FEC itself has not adopted the "extreme view of FECA's preemptive strike" that WinRed urges the Court to adopt.  *Galliano v. U.S. Postal Serv.*, 836 F.2d 1362, 1368, 1371 n.8 (D.C. Cir. 1988).  Instead, apart from issues directly regulated by the FEC, much of the activities of federal political committees are susceptible to regulation outside the scope of FECA's field.  *See id.* at 1371.  For its part, the FEC

specifically disclaims that its field reaches into questions of deceptive recurring contribution solicitations.  FEC, MUR 7201 Dismissal Report at 2 n.4 (Nov. 22, 2017); FEC, MUR 7255 Dismissal Report at 2 n.2 (Sept. 27, 2017).[13]  This further supports the conclusion that FECA's field does not include the consumer protection laws at issue here.[14]  In sum, Congress has not evinced an intent to "occupy the field" with regard to generally applicable state consumer protection laws even if these laws are applied to a federal political committee.  Therefore, field preemption does not apply.

### 3. Conflict Preemption

Finally, WinRed claims that implied conflict preemption applies.   Under conflict preemption, a state law is preempted when it is impossible for a party to comply with both state and federal law or when state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Freightliner Corp.*, 514 U.S. at 287.  WinRed does not argue that it is impossible to comply with both state and federal law here.  Instead, WinRed argues that Congress intended FECA to establish uniform

---

[13] WinRed argues that because the FEC stated it used prosecutorial discretion to decide to decline these cases this "implies that the FEC fully believed it had the requisite authority to exercise discretion in the direction of enforcement."  (Mem. Opp. Mot. to Dismiss at 14.)  This, however, contradicts FEC's conclusion that FECA does not regulate this activity and imputes more meaning to FEC's statement than the FEC may have intended.

[14] Although Courts have deferred to FEC interpretations of FECA, *e.g.*, *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37–39 (1981); *Teper*, 82 F.3d at 997, the Court reaches this conclusion without consideration of the agency's interpretation and therefore does not decide whether or how much deference to give the FEC's interpretations here.  The Court only notes the FEC's interpretations here and elsewhere as they provide additional support for the Court's independent conclusion.

standards for contributions, expenditures, and reporting in federal elections across the country and that complying with various state consumer protection laws would be an obstacle to this Congressional objective.

WinRed is correct that Congress intended to create uniform standards for federal elections. For example, when passing the express preemption provision, the House of Representatives rejected an amendment that would have allowed states to establish state-specific expenditure limits. 120 Cong. Rec. 27460, 27465 (1974). Members speaking against the amendment cited the need to keep the expenditure limit rules uniform. 120 Cong. Rec. 27462–65 (1974) (statements of Reps. Frenzel, Bingham, Koch, & Brademas). This uniform standard can also be seen in FECA and FEC's regulatory preemptive language and in cases interpreting them.

The issue for the Court here is whether the concern for uniformity extends to this case. FEC Advisory Opinions and court cases demonstrate that uniformity extends to a variety of situations that then preempt state laws. *See, e.g.*, FEC Adv. Op. 1981-27 (disclaimers on political fliers); FEC Adv. Op. 2012-10 (Apr. 27, 2012) (disclaimers on telephone polls); *Weber*, 955 F.2d at 876 n.4 (expenditure limits). Just as with the other types of preemption, the preempted state laws at issue in these cases were directly targeted at political campaigns, not laws of general applicability in areas of traditional state regulation. In Advisory Opinion 1981-27, the FEC specifically noted that even when a disclaimer requirement in an anti-littering ordinance that **specifically targeted political**

**advertising** is preempted by FECA's disclaimer requirements, federal committees are still subject to all other restrictions of the anti-political littering ordinance.  FEC Adv. Op. 1981-27.  This Advisory Opinion indicates that the uniformity Congress intended extends to disclaimer requirements contained in federal law, *e.g.*, 52 U.S.C. § 30120, but not to all laws, even those specifically targeting political communications, just because it affected a federal committee.

Here, WinRed's Complaint contends that state laws may require certain disclosures to consumers before recurring donations can take effect.  WinRed in its brief then correctly points out that the FEC has allowed recurring donations.  *See* FEC Adv. Op. 1989-26.  This, however, does not mean that the state laws interfere with the intent to create a uniform system of federal contribution and expenditure laws.  The substance of these consumer protection laws is outside FECA's preemptive reach even if certain disclosures may not be.  *See* FEC Adv. Op. 1981-27.[15]  And state law still governs issues

---

[15] For similar reasons to those embraced in FEC Advisory Opinion 1981-27, even if portions of the Attorneys General's requests were preempted by FECA, the full relief WinRed requests consisting of a declaratory judgment that the investigations are entirely preempted and a permanent injunction enjoining all investigations and actions brought under the state consumer protection statutes against WinRed may still be overbroad.  Even if state law could not require WinRed to include disclaimers on all its pages before collecting recurring donations or to routinely disclose additional details about campaign specific contributions and expenditures, WinRed may still be required to comply with the "substance" of the state consumer protection laws.  *See* FEC Adv. Op. 1981-27.  It would be meaningless to require WinRed to comply with the substance of these laws but bar any investigations, subpoenas, and investigative demands authorized under these laws or actions enforcing them.

related to the commencement and revocation of recurring contributions.  *See* FEC Adv.

Op. 1989-26 at n.3.

Although FECA created uniformity for contributions, expenditures, and their

disclosure in federal elections, it did not regulate deceptive consumer practices even in

federal political campaigns.  Congressional silence about consumer protection issues does

not mean that political contributions are exempt from other generally applicable

regulations.  *See Galliano*, 836 F.2d at 1371.  Allowing states to continue exercising their

traditional police powers in this area does not hinder Congress's objectives.  Indeed, a

conclusion otherwise would leave a hole in consumer protection law nationwide.

Because FECA does not protect consumers, preempting consumer protection laws would

have the effect of leaving contributors at the mercy of fraudulent and other impermissible

schemes as long as those schemes come cloaked in federal political committee status.

Nothing supports the conclusion Congress intended this objective.  Therefore, allowing

states to enforce their consumer protection laws and investigate violations of them

including requiring additional confidential disclosures to investigative bodies does not

conflict with the purposes and objectives of FECA.   Conflict preemption also does not

apply here.

In sum, FECA does not demonstrate a clear and manifest Congressional purpose to

preempt laws of general applicability in a field traditionally regulated by state law just

because the state laws happen to touch the activities of a federally registered political

committee.  Congress's clear and manifest purpose was to harmonize contribution and spending limits, the sources of contributions, and reporting requirements, not to preclude state-based enforcement of consumer protection laws.  Because FECA does not preempt the state laws or investigation at issue, the Complaint fails to state a claim upon which relief may be granted.  Thus, the Court will also dismiss the case against Minnesota's Attorney General.

### III.    PRELIMINARY INJUNCTION

Because the Attorneys General issued subpoenas and civil investigative demand letters to WinRed during this lawsuit, WinRed sought a preliminary injunction against enforcement of these subpoenas and demands.  The parties agreed to stay enforcement.  Because the Court will dismiss the case against all four defendants, WinRed cannot succeed on the merits, and the Court will deny WinRed's Motion as moot.  *See Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1014 (8th Cir. 2021).

### CONCLUSION

The Court will dismiss the claims against the Connecticut, Maryland, and New York Attorneys General as the Court lacks personal jurisdiction over them.  Minnesota's conspiracy-based jurisdiction does not reach them because the harms of any alleged conspiracy were not directed at Minnesota or directly felt by Minnesotans.

Although the Court has personal jurisdiction over Minnesota's Attorney General, the Court will also dismiss the claims against him because FECA does not preempt

generally applicable state consumer protection laws merely because the state seeks to apply them to a federally registered political committee.  Narrowly construing FECA's preemptive scope in this area of traditional state regulation reveals that FECA does not preempt the relevant state laws or investigations under any preemption theory.

Because the Court will dismiss all the claims, WinRed cannot succeed on the merits and the Court will deny WinRed's motion for a preliminary injunction.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for a Preliminary Injunction [Docket No. 20] is **DENIED** as moot.

2. Defendants' Motion to Dismiss [Docket No. 31] is **GRANTED** as follows:

   a. Plaintiff's Complaint [Docket No. 1] against Defendants Letitia James, William Tong, and Brian Frosh is **DISMISSED without prejudice**; and

   b. Plaintiff's Complaint [Docket No. 1] against Defendant Keith Ellison is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  January 26, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court